IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ELLY MARISOL ESTRADA
an individual, et al.,

    Plaintiffs,

      v.

MARK BECKER
President of Georgia State University,
in his individual and official capacity,
et al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:16-CV-3310-TWT

## OPINION AND ORDER

This is a civil rights action challenging an admissions policy of the University System of Georgia. It is before the Court on the Defendants' Motion to Stay Proceedings [Doc. 72], Motion to Dismiss [Doc. 30], and Motion to Dismiss the First Amended Complaint [Doc. 52], as well as the Plaintiffs' Motion for Preliminary Injunction [Doc. 38]. For the following reasons, the Defendants' Motion to Stay Proceedings [Doc. 72] is DENIED, the Defendants' Motion to Dismiss the First Amended Complaint [Doc. 52] is GRANTED, and the Plaintiffs' Motion for Preliminary Injunction [Doc. 38] and the Defendants' Motion to Dismiss [Doc. 30] are DENIED as moot.

# I. Background

The Plaintiffs include noncitizen graduates of Georgia high schools who were brought into the United States as children, and have since received deferred action status under the federal Deferred Action for Childhood Arrivals policy, also known as DACA.[1] DACA was established by Presidential executive order in 2012. In substance, it provides for the exercise of prosecutorial discretion to defer removal action against individuals who meet certain requirements. Deferred action recipients are then allowed to remain in the United States during a period of stay specified by the Department of Homeland Security.[2] The Defendants include the Presidents of five selective Georgia institutions of higher education,[3] as well as the members of the Georgia Board of Regents.

The same year that DACA was adopted, the Georgia Board of Regents adopted a number of state policies concerning eligibility for admission to selective Georgia universities. In particular, Policy 4.1.6 provides that "[a] person who is not lawfully present in the United States shall not be eligible for admission to any University

---

[1] Amended Compl. ¶¶ 9-11. The Plaintiffs also include the Savannah Undocumented Youth Alliance, a membership organization whose members have been affected by the policies at issue in this case.

[2] Id. at ¶¶ 45.

[3] I.e., Georgia Institute of Technology, University of Georgia, Georgia State University, Augusta University, and Georgia College and State University.

System institution which, for the two most recent academic years, did not admit all academically qualified applicants..."[4] Policy 4.3.4 requires those selective institutions to verify the lawful presence of all admitted applicants.[5] The Plaintiffs challenge these policies, claiming that they are "lawfully present" due to their status under DACA, that they are otherwise eligible for admission to the institutions at issue, and they have suffered harm by having to either attend less prestigious schools or leave the state to attend comparable institutions.

On April 26, 2016, an action was filed in the Superior Court of Fulton County that is similar to this case.[6] In that case, the plaintiffs were DACA recipients who were denied in-state tuition at University System of Georgia institutions. In particular, the plaintiffs were denied in-state tuition because they were not considered "lawfully present" for purposes of state provisions similar to those at issue in this case. On December 30, 2016, the Superior Court found in favor of the plaintiffs and the defendants appealed to the Georgia Court of Appeals, where the case is currently

---

[4]     Id. at ¶ 48.

[5]     Id. at ¶ 49.

[6]     See Rigoberto Rivera Hernandez, et al. v. C. Dean Alford, et al., No. 2016-cv-274418 (Ga. Super. Ct. Dec. 30, 2016).

pending.[7] The Defendants now move to stay proceedings in this action until the state case is resolved, and in the alternative to dismiss the suit for failure to state a claim.

## II. Legal Standard

A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief.[8] A complaint may survive a motion to dismiss for failure to state a claim, however, even if it is "improbable" that a plaintiff would be able to prove those facts; even if the possibility of recovery is extremely "remote and unlikely."[9] In ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff.[10] Generally, notice pleading is all that is required for a valid

---

[7] The Georgia Court of Appeals originally sent the case directly to the Georgia Supreme Court for review of federal preemption issues. The Georgia Supreme Court, seeing no preemption issues, sent the case back to the Court of Appeals.

[8] Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009); Fed. R. Civ. P. 12(b)(6).

[9] Bell Atlantic v. Twombly, 550 U.S. 544, 556 (2007).

[10] See Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A., 711 F.2d 989, 994-95 (11th Cir. 1983); see also Sanjuan v. American Bd. of Psychiatry & Neurology, Inc., 40 F.3d 247, 251 (7th Cir. 1994) (noting that at the pleading stage, the plaintiff "receives the benefit of imagination").

complaint.[11] Under notice pleading, the plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests.[12]

### III. Discussion

**A. Motion to Stay**

The doctrine of abstention permits a district court to decline or postpone the exercise of its jurisdiction under a variety of circumstances. However, "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule."[13] The Supreme Court has laid out four main doctrines under which federal courts may abstain, known by the cases in which they were first promulgated: <u>Pullman</u>, <u>Younger</u>, <u>Burford</u>, and <u>Colorado River</u>.[14] Each doctrine applies to a unique set of circumstances and has its own requirements. The Defendants have cited several abstention doctrines without

---

[11]     See <u>Lombard's, Inc. v. Prince Mfg., Inc.</u>, 753 F.2d 974, 975 (11th Cir. 1985), <u>cert. denied</u>, 474 U.S. 1082 (1986).

[12]     See <u>Erickson v. Pardus</u>, 551 U.S. 89, 93 (2007) (citing <u>Twombly</u>, 550 U.S. at 555).

[13]     Colorado River Water Conservation Dist. v. U.S., 424 U.S. 800, 813 (1976).

[14]     See <u>Railroad Commission v. Pullman Co.</u>, 312 U.S. 496 (1941); <u>Younger v. Harris</u>, 401 U.S. 37 (1971); <u>Burford v. Sun Oil Co.</u>, 319 U.S. 315 (1943); <u>Colorado River</u>, 424 U.S. at 800. There are other abstention doctrines, but they were not cited by the Defendants, nor are they applicable here.

clearly identifying which doctrines they believe are applicable to this particular situation. As a result, the Court will address all four.

### 1. **Younger** Abstention

<u>Younger</u> abstention applies where there is (1) an ongoing state judicial proceeding that (2) implicates important state interests and (3) provides an adequate opportunity for raising federal constitutional questions.[15] However, the type of judicial proceedings <u>Younger</u> is concerned with are enforcement proceedings "akin to criminal prosecution," that are "characteristically initiated to sanction the federal plaintiff, i.e., the party challenging the state action, for some wrongful act."[16] Because there is no state enforcement proceeding in this case, <u>Younger</u> does not apply.

### 2. **Burford** Abstention

<u>Burford</u> abstention, meanwhile, applies:

(1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.[17]

---

[15]    See <u>Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n</u>, 457 U.S. 423, 432 (1982).

[16]    <u>Sprint Commc'ns, Inc. v. Jacobs</u>, 134 S. Ct. 584, 592 (2013).

[17]    <u>New Orleans Pub. Serv., Inc. v. Council of New Orleans</u>, 491 U.S. 350, 361 (1989) (internal quotations omitted).

The purpose of <u>Burford</u> abstention is to "protect [ ] complex state administrative processes from undue federal interference."[18] Even assuming that the policies of the Board of Regents count as a large and complex scheme, the Plaintiffs in this case "focus their attack upon a single statute whose possible invalidation could scarcely be expected to disrupt" Georgia's entire university system.[19] In addition, the state law at issue implicates important issues of federal law. As such, there is simply "no overriding state interest, special state competence, or threat to [Georgia's] administration of its own affairs that would warrant denying appellants access to their chosen federal forum and relegating their various federal claims to the courts of [Georgia]."[20]

---

[18]    <u>Id.</u> at 362.

[19]    <u>BT Inv. Managers, Inc. v. Lewis</u>, 559 F.2d 950, 955 (5th Cir. 1977) (finding <u>Burford</u> abstention inappropriate where the plaintiffs had only challenged one statute of the Florida Banking Code).

[20]    <u>Id.</u>

### 3. **Pullman** Abstention

Under the Pullman doctrine, federal courts are given the ability to abstain from exercising jurisdiction in "deference to state court resolution of underlying issues of state law."[21] Pullman applies only in cases raising constitutional challenges, and then only when: "(1) the case [also] presents an unsettled question of state law, and (2) the question of state law is dispositive of the case or would avoid, or substantially modify, the constitutional question presented."[22] In this case, there are two possible interpretations of the state policies at issue. Either (1) the policies' use of the term "lawfully present" is coterminous with federal law, or (2) it differs in some material way. Regardless of which interpretation of the policy is correct, the case would not be resolved. Under the first scenario, a court would still need to determine who federal law defines as "lawfully present." The second scenario, meanwhile, would then raise significant questions of preemption and equal protection. Because the issue of state law would not be dispositive in this case, Pullman abstention is unwarranted.

---

[21]    Rindley v. Gallagher, 929 F.2d 1552, 1554 (11th Cir. 1991) (quoting Harman v. Forssenius, 380 U.S. 528, 534 (1965)).

[22]    Id. at 1554-55 (citing Duke v. James, 713 F.2d 1506, 1510 (11th Cir. 1983)).

## 4. __Colorado River__ Abstention

Lastly, the <u>Colorado River</u> doctrine permits a district court to abstain "when there is a concurrent state court action concerning the same matter."[23] The Eleventh Circuit has interpreted <u>Colorado River</u> and its progeny to include a list of factors that should be considered when considering abstention under this doctrine, namely:

> (1) whether one of the courts has assumed jurisdiction over property, (2) the inconvenience of the federal forum, (3) the potential for piecemeal litigation, (4) the order in which the fora obtained jurisdiction, (5) whether state or federal law will be applied, and (6) the adequacy of the state court to protect the parties' rights.[24]

These factors must be weighed "flexibly and pragmatically, not as a 'mechanical checklist,'" and the ultimate decision must be "heavily weighted in favor of the exercise of jurisdiction."[25]

---

[23] <u>AFC Enterprises, Inc. v. Restaurant Group LLC</u>, No. 1:10-CV-1772-TWT, 2010 WL 4537812, at *3 (N.D. Ga. Nov. 3, 2010) (citing <u>Colorado River</u>, 424 U.S. at 813).

[24] <u>Ambrosia Coal & Const. Co. v. Pages Morales</u>, 368 F.3d 1320, 1331 (11th Cir. 2004).

[25] <u>Id.</u> at 1332 (quoting <u>Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.</u>, 460 U.S. 1, 16 (1983)).

Here, neither the first nor fifth factors apply.[26] Similarly, the second factor does not favor abstention. The convenience factor "should focus primarily on the physical proximity of the federal forum to the evidence and witnesses."[27] The Court of Appeals of Georgia is no more convenient than the federal courthouse. The two are located less than one mile apart.

The third factor, the potential for "piecemeal litigation," also counsels against abstention. The concern here is not with "run of the mill piecemeal litigation," but rather with piecemeal litigation that is "abnormally excessive or deleterious."[28] But in situations in which litigation is "inevitably piecemeal," abstention is not favored.[29] Litigation is inevitably piecemeal when resolution of one case would still leave the other action unresolved no matter how the first action was disposed. In this case, the state action involves completely different plaintiffs and addresses Georgia's tuition

---

[26]    Neither court has assumed jurisdiction over property. And the Plaintiffs' claims are not included in the state action, "eliminat[ing] any justification for the stay that might be attributable to the prior filing of the state court action." Am. Mfrs. Mut. Ins. Co. v. Edward D. Stone, Jr. & Assoc., 743 F.2d 1519, 1525 (11th Cir. 1984) (hereinafter "AMMIC").

[27]    Ambrosia Coal, 368 F.3d at 1332.

[28]    Jackson-Platts v. Gen. Elec. Capital Corp., 727 F.3d 1127, 1142 (11th Cir. 2013) (quoting Ambrosia Coal, 368 F.3d at 1333).

[29]    Id. (quoting Am. Mfrs. Mut. Ins. Co. v. Edward D. Stone, Jr. & Assoc., 743 F.2d 1519, 1525 (11th Cir.1984)).

related policies, not policies related to admission. The state action cannot provide relief to the Plaintiffs in this case, though the relevant language is identical under both policies. Because this Court cannot force the Plaintiffs to assert their claims in the state proceeding, a stay order would not avoid, but merely delay, piecemeal consideration of the claims.[30]

The fifth factor requires the Court to determine whether state or federal law provides the rule of decision.[31] First and foremost, though the policies to be interpreted in this case are in one sense matters of state law, federal law is clearly at the heart of this dispute. Furthermore, "this factor favors abstention only where the applicable state law is particularly complex or best left for state courts to resolve."[32] The state law issues raised by the admissions policies at issue here are not so difficult that they could not be easily handled by this or any other federal court. And lastly, though the Court is confident that the Georgia Superior Court is more than adequate to protect the parties' rights, "[t]he fact that both forums are adequate to protect the

---

[30]     See AMMIC, 743 F.2d at 1525 (holding litigation to be "inevitably piecemeal" in a case involving claims between two parties who were co-defendants in a state action).

[31]     See Jackson-Platts v. Gen. Elec. Capital Corp., 727 F.3d 1127, 1143 (11th Cir. 2013).

[32]     Id.

parties' rights merely renders this factor neutral."[33]  After carefully reviewing all of the

Colorado River factors, none of them compel abstention, and most expressly disfavor

it. Therefore, the Defendants' motion to stay this case pending the outcome of the

related state action is denied.

**B. Motion to Dismiss**

Having denied the Defendants' motion to stay, the Court now turns to the

Motion to Dismiss. The Plaintiffs allege that the Defendants' policies violate both the

Equal Protection Clause and the Supremacy Clause.[34] The Supreme Court has said that

the Equal Protection Clause means "that all persons similarly situated should be

treated alike."[35] Of course, this does not mean that the Plaintiffs need to be similar in

all respects to others who are eligible for admission to Georgia's selective educational

institutions, nor that the government cannot distinguish among its citizens at all.

Rather, the Equal Protection Clause "simply keeps governmental decisionmakers from

treating differently persons who are in all *relevant* respects alike."[36]

---

[33]     Id. (quoting Noonan S., Inc. v. Volusia Cty., 841 F.2d 380, 383 (11th Cir. 1988)).

[34]     See U.S. Const., Amend. XIV, § 1; U.S. Const., Art. VI, cl. 2

[35]     City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).

[36]     Nordlinger v. Hahn, 505 U.S. 1, 10 (1992) (emphasis added).

The only relevant factor in this case is whether the Plaintiffs are "lawfully present."[37] Both parties agree that federal law is controlling in the arena of immigration law, but they disagree on what the law is and whether the Board of Regents' policies run afoul of it. The Defendants argue that the Plaintiffs are not similarly situated to other noncitizens eligible for admission because DACA is a creature of prosecutorial discretion, not statute. As a result, DACA recipients' presence in the United States is not "lawful," as defined by the Immigration and Naturalization Act ("INA"), but rather a reflection of the President's decision to abstain from enforcing the Act under certain circumstances. The Plaintiffs, meanwhile, contend that DACA has given them lawful presence and that they are therefore similarly situated to other noncitizens, including refugees and asylees.[38] Because DACA has made them lawfully present in the United States, the Plaintiffs argue that the Defendants' policy conflicts with federal law. The Plaintiffs' Equal Protection claim is therefore inextricably bound to whether Georgia's policies are preempted by DACA.

_____

[37]     That is the only factor Georgia uses under the challenged policy to determine whether a student is considered for admission.

[38]     See Compl. ¶ 60.

"Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect."[39] At times, this principle can lead to conflict, but the "Supremacy Clause provides a clear rule that federal law 'shall be the supreme Law of the Land...'"[40] The Supreme Court has interpreted this clause to mean that Congress has the ability to preempt state laws with which federal law comes into conflict.[41] There are three types of preemption: express, conflict, and field. Express preemption occurs when a statute contains an express provision preempting state law.[42] The parties agree that Congress has not done so here. Conflict preemption occurs when it is either impossible to follow both state and federal law, or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[43] Field preemption occurs when state law touches on a "field that Congress, acting within its proper authority, has determined must be regulated by its exclusive

---

[39]     Arizona v. United States, 132 S. Ct. 2492, 2500 (2012).

[40]     Id. (quoting U.S. Const., Art. VI, cl. 2).

[41]     Id. at 2500-01.

[42]     Id.

[43]     Id. (quotations omitted).

governance."[44] Importantly, however, the general assumption is that the "'historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'"[45]

The Plaintiffs' arguments for conflict preemption are unpersuasive. In order to "stand[] as an obstacle" to congressional objectives, the Plaintiffs must point to a "clear and manifest purpose of Congress," which they fail to do.[46] It is certainly the case that federal regulations may, under certain circumstances, preempt state law. Indeed, the Supreme Court "has recognized that an agency regulation with *the force of law* can pre-empt conflicting state requirements."[47] But federal regulations only have the force of law when they follow certain procedural requirements, like notice-and-comment rulemaking.[48] "When Congress authorizes an agency to proceed through

---

[44]     Id. at 2501.

[45]     Id. at 2501 (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)).

[46]     The Plaintiffs do not argue that it is impossible to follow both federal and state law here.

[47]     Wyeth v. Levine, 555 U.S. 555, 576 (2009) (emphasis added).

[48]     See Perez v. Mortg. Bankers Ass'n, 135 S. Ct. 1199, 1203-04 (2015) (stating that interpretive rules and policy statements do not carry the force of law). See also River Runners for Wilderness v. Martin, 593 F.3d 1064, 1071 (9th Cir. 2010) (citing United States v. Fifty–Three (53) Eclectus Parrots, 685 F.2d 1131, 1136 (9th Cir. 1982)).

notice-and-comment rulemaking, that relatively formal administrative procedure is a very good indicator that Congress intended the regulation to carry the force of law."[49] DACA, notably, did not go through notice-and-comment rulemaking, but was announced through a simple policy memo. Therefore, DACA cannot be said to have gone through the procedural rigors necessary to demonstrate a "clear and manifest purpose of Congress" on its own terms.

Alternatively, the Plaintiffs contend that DHS has the authority to render an alien lawfully present, and therefore entitled to all the benefits that come with that designation, by way of the broad grants of power contained in 8 U.S.C. § 1103.[50] Under the Plaintiffs' view, because the INA gave DHS the power to enforce it, Georgia's policies frustrate a "clear and manifest purpose of Congress" to grant DHS broad discretion in granting deferred action status. But this argument is equally lacking.

---

[49]    Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117, 2125 (2016).

[50]    See, e.g., 8 U.S.C. § 1103(a)(3) ("[The Secretary] shall establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter.").

The Fifth Circuit recently addressed this issue, and was upheld by an equally divided Supreme Court.[51] In that case, Texas sought a preliminary injunction against DHS to prevent implementation of Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA"), a program similar to DACA. The plaintiffs argued that the broad grants of authority contained in the INA, including 8 U.S.C. § 1103, authorized DHS to implement deferred action programs like DAPA and DACA. But the Fifth Circuit disagreed, stating that "broad grants of authority...cannot reasonably be construed as assigning decisions of vast economic and political significance, such as [DACA], to an agency."[52] To view them otherwise would undermine the very fabric of the INA itself, as it would give the President the ability "to grant lawful presence and work authorization to any illegal alien in the United States—an untenable position in light of the INA's intricate system of immigration classifications and employment eligibility."[53] The Plaintiffs cite no other provision

---

[51]     Texas v. United States, 809 F.3d 134 (5th Cir. 2015), aff'd by an equally divided court, U.S. v. Texas, 136 S.Ct. 2271, 2272, 195 L.Ed.2d 638 (2016) (per curiam).

[52]     Id. at 183 (quotations omitted).

[53]     Id.  The Court does not take any position whatsoever regarding the constitutionality of DACA or the President's executive authority to prioritize deportations. This opinion is limited solely to the issue of whether such actions can preempt state law.

in the INA to show a clear and manifest purpose on the part of Congress to delegate

such broad authority to the Executive that would preempt state law.[54]

At most, DACA is a temporary reprieve from prosecution; it does not change

a recipient's status and make them eligible for otherwise unavailable benefits.[55] When

DHS uses the term "lawful presence" in DACA, it is using it for the limited purpose

of stating that recipients do not accrue "unlawful presence" for determining later

admissibility to the United States. Indeed, the DHS memo announcing the creation

of DACA expressly acknowledged that DACA "confers no substantive right,

immigration status or pathway to citizenship. Only the Congress, acting through its

legislative authority, can confer these rights."[56] And when given the opportunity to do

---

[54]     The only other statute the Plaintiffs cite outside of 8 U.S.C. § 1103 is a narrow provision of the Real ID Act of 2005, Pub. L. No. 109-13, § 202(c), 119 Stat. 231, which identifies deferred action recipients as being present in the United States during a period of authorized stay, for the purpose of issuing state identification cards. But as described below, "[t]his narrow provision also can't be authority for the proposition that the INA 'delegated to the executive branch' the wholesale authority to preempt state law by declaring immigrants legal when they are not." Arizona Dream Act Coal. v. Brewer, No. 15-15307, 2017 WL 461503, at *3 (9th Cir. Feb. 2, 2017) (Kozinski, J., dissenting).

[55]     See Texas, 809 F.3d at 167. See also Ga. Latino Alliance for Human Rights v. Governor of Ga., 691 F.3d 1250, 1258 n.2 (11th Cir. 2012) ("Deferred action status, also known as non-priority status, amounts to, in practical application, a reprieve for deportable aliens.").

[56]     Defs.' Mot. to Dismiss, Ex. A [Doc. 30-2].

just that on multiple occasions, Congress has expressly *declined* to do so.[57] The Plaintiffs have failed to show a "clear and manifest purpose of Congress" to grant the Executive widespread authority to preempt state law in this area. If anything, Georgia is using the exact same categories as federal law: the ones written by Congress. As such, Georgia's policies cannot conflict with DACA because DACA is not federal law for preemption purposes.

Nor are the Plaintiffs' field preemption arguments persuasive. The basic concept of field preemption is "that States may not enter, in any respect, an area the Federal Government has reserved for itself."[58] The "[p]ower to regulate immigration is unquestionably exclusively a federal power."[59] "The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens."[60] But not "every state enactment which in any way deals with aliens is a

---

[57]    See Texas, 809 F.3d at 185 ("Congress has repeatedly declined to enact the Development, Relief, and Education for Alien Minors Act ("DREAM Act"), features of which closely resemble DACA and DAPA.").

[58]    Arizona, 132 S. Ct. at 2502.

[59]    DeCanas v. Bica, 424 U.S. 351, 354 (1976) *overruled on other grounds by* Ky. Ass'n of Health Plans, Inc. v. Miller, 538 U.S. 329 (2003)).

[60]    Arizona, 132 S. Ct. at 2498.

regulation of immigration."[61] Indeed, state law only becomes a "regulation of immigration" if it "is essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain."[62] Denying admission to selective Georgia institutions of higher education, using the same categories Congress itself has adopted, is not tantamount to denying admission to the country.

The cases the Plaintiffs cite to the contrary are easily distinguishable. The laws at issue in <u>United States v. Alabama</u>, 691 F.3d 1269 (11th Cir. 2012) (state law making contracts with illegal immigrants unenforceable) and <u>Lozano v. City of Hazleton</u>, 724 F.3d 297 (3d Cir. 2013) (housing ordinances regulating residence based on immigration status) were both preempted by federal law because they effectively forced immigrants to move out of the state or locality. Admission to a selective university, meanwhile, is not the same as the ability to contract or find housing. One can hardly say that the inability to be admitted to the University of Georgia would force someone to move out of the state, in the way that the inability to find housing would. Indeed, Georgia does not even restrict admission to all institutes of higher education; there are many collegiate programs in Georgia that the Plaintiffs might be

---

[61]     <u>DeCanas</u>, 424 U.S. at 355.

[62]     <u>Id.</u>

admitted to. And unlike the policies at issue in <u>Hispanic Interest Coal. of Alabama v.</u> <u>Bentley</u>, No. 5:11-CV-2484-SLB, 2011 WL 5516953, at *1 (N.D. Ala. Sept. 28, 2011), <u>aff'd in part, vacated in part, rev'd in part sub nom. Hispanic Interest Coal. of Alabama v. Governor of Alabama</u>, 691 F.3d 1236 (11th Cir. 2012), the policies in this case do not purport to come up with new classifications of immigrants.[63]

The Supreme Court has stated that it "will not presume that Congress, in enacting the INA, intended to oust state authority to regulate...in a manner consistent with pertinent federal laws."[64] In this case, Georgia's policy is consistent with pertinent federal law, in that it adopts the categories and classifications of aliens contemplated by Congress in the INA. Nothing in the INA suggests that Congress has delegated the authority to designate an entirely new class of persons as lawfully present. Because Georgia follows federal law, the state policies are not preempted.

Returning to the Equal Protection analysis, the Plaintiffs cannot be said to be similarly situated to other noncitizens who are eligible for admission under the policy because they do not have lawful status and are not lawfully present as defined by

---

[63]     The Alabama policies denied admission to public postsecondary educational institutions to anyone who was not lawfully present. However, the original policies defined lawfully present as possessing "lawful permanent residence or an appropriate nonimmigrant visa."

[64]     <u>DeCanas</u>, 424 U.S. 351, 357 (1976).

Congress. Without being similarly situated, the Plaintiffs' Equal Protection claim must also fail.

## IV. Conclusion

For the reasons stated above, the Defendants' Motion to Dismiss the First Amended Complaint [Doc. 52] is GRANTED. The Defendants' Motion to Stay Proceedings [Doc. 72] is DENIED. The Defendants' Motion to Dismiss [Doc. 30] and the Plaintiffs' Motion for Preliminary Injunction [Doc. 38] are DENIED as moot.

SO ORDERED, this 15 day of May, 2017.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge